**FILED**

AO 91 (REV 5/85) Criminal Complaint

AUSA Tony Iweagwu (312) 469-6151

JAN 2 5 2011 **NF**

JAN 25 2011

MICHAEL W. DOBBINS
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINIOS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. **11 CR 0054** |
| vs. | ) |
| | ) |
| JACINTO "JOHN" GABRIEL, JR. | ) **Criminal Complaint** |

MAGISTRATE JUDGE SCHENKIER

I, the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about March 11, 1010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant JACINTO "JOHN" GABRIEL, JR:

> made and presented, and caused to be made and presented, to the Department of Health and Human Services, a department and agency of the United States, a claim upon and against the United States, namely, a Medicare reimbursement claim submitted through Medicare contractor Palmetto GBA, in the amount of approximately $2,586, for home health care services allegedly provided to a Medicare beneficiary ("RS"), knowing such claim to be false, fictitious, and fraudulent,

in violation of Title 18, United States Code, Sections 287 and 2. I further state that I am a Special Agent of the U.S. Department of Health and Human Services, Office of Inspector General, and that this complaint is based on the following facts:

**see attached affidavit**

Continued on the attached sheet and made a part hereof:   _X_  Yes       ___  No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

January 25, 2011_____     at     Chicago, Illinois_____
Date                                                                City and State

_____
Sidney I. Schenkier, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

# AFFIDAVIT

I, BENJAMIN FOLGER, being duly sworn, state as follows:

## I. Introduction

1.     I am a Special Agent of the United States Department of Health and Human Services, Office of Inspector General ("DHHS/OIG"), and I have been so employed since July 2002. I have received training in the area of criminal investigation, including physical and electronic surveillance, conducting undercover investigations, and interviewing defendants and witnesses. My current responsibilities include investigating allegations of fraud involving government-funded health care programs, including the Medicare and Medicaid programs.

2.     As a DHHS/OIG Special Agent, I have participated in numerous health care fraud investigations, including investigations of home health care providers. As a result of my training and experience, I have become familiar with the methods in which criminals conduct health care fraud, including fraudulent billing for medical services that were not provided or were not medically necessary, paying kickbacks in exchange for referrals of patients, and money laundering.

3.     This affidavit is made in support of a criminal complaint and a warrant to arrest JACINTO "JOHN" GABRIEL, JR. for a violation of Title 18, United States Code, Sections 287 and 2. Section 287 provides, in part, that

"[w]hoever makes or presents to . . . any department or agency [of the United States], any claim upon or against the United States, or any agency or department thereof, knowing such claim to be false, fictitious, or fraudulent," is guilty of a crime. Under Title 18, United States Code, Section 2, "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

4.     GABRIEL is the suspected owner and operator of two related home health care providers, specifically "Company A," located at 4821 West 153rd Street, Oak Forest, Illinois, and 238 West Cermak Road, Chicago, Illinois; and "Company B," located at 4747 West Peterson Avenue, Suite 311, Chicago, Illinois 60646. As described in more detail below, there is probable cause to believe that GABRIEL, together with others known and unknown, knowingly and willfully defrauded the Medicare program by submitting false claims for reimbursement of home health care services allegedly provided to elderly people, which services were never provided, were not medically necessary, or were inflated in price, all so that GABRIEL and his associates could fraudulently obtain money from the Medicare program.

5.     The investigation of GABRIEL is being conducted jointly by DHHS/OIG, the Federal Bureau of Investigation, and the Internal Revenue

2

Service's Criminal Investigation Division.[1] I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation. More specifically, I have participated in interviews of witnesses, reviewed reports prepared by other agents and investigators, and reviewed other evidence obtained during the investigation, including Medicare records. I also have discussed the facts of this investigation with other agents and with private contract investigators who had information relevant to the investigation.

6.     Since this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint, this affidavit does not contain all of the facts known by me with regard to the investigation and the individuals and events described herein. All interviews referenced in this affidavit are described in summary, non-verbatim form; such summaries do not constitute, and do not purport to be, detailed recitations of all statements made by all of the participants in the interviews. Finally, all dates and dollar amounts referenced herein are approximate.

## II. The Medicare Program

7.     Medicare is a federally-funded national health care benefit program which provides free or below-cost health care benefits to certain eligible

---

[1] For the sake of simplicity, the term "agents" shall be used in this affidavit when referring to agents from one or more of these federal investigative agencies.

individuals ("Medicare beneficiaries"), primarily individuals who are least 65 years of age or who have certain disabilities. Medicare is comprised of several different "parts," most notably: "Part A," which covers a portion of the costs of hospital inpatient stays and home health care; and "Part B," which covers a portion of certain outpatient physician visits and services.

8. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of DHHS. CMS in turn contracts with other organizations, usually health insurance carriers, to process Medicare claims and to perform certain administrative functions. In Illinois, CMS currently contracts with a health insurance carrier known as Palmetto GBA ("Palmetto") to administer and pay Part A claims which are eligible for reimbursement under the Medicare program.

9. It is the primary responsibility of the insurance contractor (in this case, Palmetto) to review and process Medicare claims submitted by health care providers who are authorized to participate in the Medicare program ("Medicare providers"). Palmetto pays those claims which appear, based on the information provided by the Medicare providers, to be eligible for reimbursement under the Medicare program. Payment is made with federal funds.

10. Medicare providers may submit claims to Palmetto either by mail or electronically by computer. Either way, the Medicare provider is required to

4

submit certain information to Palmetto, including the name and Medicare beneficiary number of the individual to whom the medical service was provided, the date on which the service was provided, the location where the service was provided, the type of service provided, and a certification that such service was personally rendered by the Medicare provider.

11.     Medicare providers are entitled to be paid only for reasonable and medically-necessary services that have been provided to Medicare beneficiaries. With regard to home health care, Medicare covers certain medically-necessary services provided in the beneficiary's home, provided the beneficiary meets the definition of being "homebound." The term "homebound" is defined as "a condition due to illness or injury that restricts [a person's] ability to leave [his or her] place of residence except with the aid of: supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated." *Medicare Benefit Policy Manual*, ch. 7, § 30.1.1. To be eligible for Medicare coverage, the homebound beneficiary must be under the care of a physician who has signed a CMS form known as a "Medicare Home Health Certification and Plan of Care" (CMS form 485), setting forth the beneficiary's condition, types of medical services needed, the frequency such services are to be provided, and a certification that home health services are reasonable and

5

necessary.

12.     Skilled nursing care, physical therapy, and continuing occupational therapy are examples of home health care services which may be covered by Medicare, provided such services are "reasonable" and "necessary," as defined in the Medicare Benefit Policy Manual (Chapter 7, Sections 40.1, 40.2.2, 40.2.4).

13.     Obtaining Medicare reimbursement for home health services involves the following process:

(a)     A service must be provided by the home health care provider to the patient before a claim may be made for reimbursement.

(b)     Prior to submitting a claim, the home health care provider must assess the patient and submit to Medicare the clinical data required within an Outcome and Assessment Information Set ("OASIS") form. This data is typically obtained by a nurse in a face-to-face visit with the patient in order to determine if the patient is homebound, the severity of the patient's symptoms, and the level of skilled care required of the home health care provider.

(c)     One section on the OASIS form to be completed by a nurse during the initial assessment of the patient is called the Activities of Daily Living ("ADL") section. The ADL section requires certain information about whether a patient needs assistance or whether he or she can do certain basic living activities independently, such as combing his or her hair, shaving, dressing, using the bathroom, shopping, and other activities.

(d)     The OASIS form also contains a Nurse's Assessment section. In that section, the examining nurse assesses the patient's condition, based on her examination, observations, and discussions with the patient.

(e)     Home health care providers are required to enter the information collected from the OASIS forms into a software program available from CMS.

6

(f)     The CMS software program identifies the rate of reimbursement for a patient for a 60-day period of home health care. Medicare typically approves home health care for 60-day periods of time. The 60-day periods are referred to as "cycles." An initial cycle of home health care is known as a Start of Care ("SOC"). After the SOC, a patient must be "recertified" by a physician to receive additional 60-day cycles of home health care. These new cycles are known as "recertifications."

(g)     After services have been provided to a patient, the home health care provider submits a Request for Anticipated Payment ("RAP") claim for such services, using the reimbursement rate identified from the OASIS form.

(h)     The Medicare claims contractor (which in this region is Palmetto) processes the RAP claim and generally pays 60% of the identified reimbursement rate to the home health care provider. The rate of reimbursement to the provider depends on the severity of the patient's symptoms, the patient's daily living activities, and the diagnosis, as reflected on the OASIS form.

(i)     After the 60-day period is completed, the home health care provider submits a final claim to Palmetto, and Palmetto reimburses the remaining 40% of payment owed to the provider. Palmetto makes payments on claims by check or wire (electronic funds transfer) to the home health care provider or its designee.

### III. Background on Company A and Company B

#### A.     *Background on Company A*

14.     Company A has an Internet website on which it advertises to the general public. The website states that Company A "is a [M]edicare certified home health care agency that is licensed by the Illinois Department of Public Health to provide home health care services to individuals in need of care." The website further states that Company A offers a variety of services, including

"Skilled Nursing," "Physical, Occupational & Speech Therapies," "Home Health Aides," and "Medical Social Worker." The website further states that Company A serves a five-county area (Cook, DuPage, Lake, Will, and Kane) and that "[a]n experienced staff is on call after office hours, Saturday, Sunday and Holidays to assist you with any needs or questions you may have."

15.     Records of the Illinois Department of Public Health confirm that Company A is licensed as a home health care agency, located at 4821 West 153rd Street, Oak Forest, Illinois.  At that location is an office building, in which Company A leases office space.  Company A leases the office space from a corporation known as "HJ Holdings, LLC," the president of which, according to corporate records on file with the Illinois Secretary of State, is GABRIEL's brother.

16.     In 2005, Company A applied for enrollment in the Medicare program.  Company A's Medicare enrollment application was signed by the company's administrator.  Medicare granted Company A's application and issued a Medicare provider number to Company A, pursuant to which Company A could begin participating in the Medicare program, effective April 25, 2006.

17.     In May 2006, Company A submitted to Medicare an Authorization Agreement for Electronic Funds Transfer, setting forth its bank account information so that it could begin receiving Medicare reimbursement payments

8

directly into its bank account at JP Morgan Chase Bank (account xxxxx9393).

18.    A cooperating individual ("C1") has informed me that Company A has approximately 130 employees.[2]

### B.    Background on Company B

19.    Company B is licensed by the Illinois Department of Public Health as a home health agency, located at 4747 West Peterson Avenue, Suite 311, Chicago, Illinois 60646.  Unlike Company A, Company B does not have an Internet website.

20.    Company B applied for enrollment in the Medicare program in 2004. Company B's Medicare enrollment application was signed by Company B's president and CEO.

21.    Medicare granted Company B a Medicare provider number, effective October 13, 2004.  Company B subsequently submitted an Authorization Agreement for Electronic Funds Transfer, and is currently receiving Medicare payments from Palmetto to its Chase bank account (account xxxx4411).

---

[2] During the investigation, agents obtained information from two cooperating individuals ("C1" and "C2"), both of whom worked for Company A's related company, Company B, and both of whom became acquainted with GABRIEL. Having worked at Company B, C1 and C2 are more familiar with Company B's offices and operations, described in more detail below, than Company A's. C1 is familiar with Company B's offices and operations from having worked at Company B for about the past two years. C2 worked at Company B during 2008 and 2009. The information and assistance provided by C1 and C2 during the course of this investigation is set forth in more detail below.

22. C1 has informed me that Company B employs more than forty people, including about thirty field workers (registered nurses, licensed practical nurses, and certified nursing assistants); ten office staff members; three marketers; and a Medicare biller. C1 and the other cooperating individual, C2, have stated that several of these Company B employees split their time working between Company B and Company A. C1 and C2 claim to have personally witnessed certain employees at both locations. C1 also has stated that some employees receive paychecks from both Company A and Company B.[3]

## C. *GABRIEL's Control Over Company A and Company B*

23. According to C1 and C2, GABRIEL is the "behind the scenes" owner of both Company A and Company B. C1 and C2 have stated, in sum and substance, that GABRIEL: (a) frequently comes to Company A and Company B to direct business operations; (b) often tells Company A and Company B employees that he is "in charge"; (c) conducts staff meetings at Company A and Company B; (d) has the authority to fire any Company A or Company B employee; (e) has the authority to countermand any business decisions made by employees of Company A and Company B; and (f) directs much of the fraudulent

---

[3] Agents have reviewed records from JP Morgan Chase Bank, where Company A and Company B maintain several accounts, and those records show that during 2009 and 2010, multiple checks were issued by Company A and Company B to the same employees.

10

conduct which is taking place there (described in more detail below).

24.    On September 23, 2010, C1 wore an audio- and video-recording device while working at Company B. C1 was provided this recording device by agents, and she conducted the recording under the supervision of agents. I have reviewed the audio- and video-recording made by C1 on September 23, 2010, as well as a draft translation of conversations conducted between C1 and others, including GABRIEL. In reviewing the video recording, I observed a person who C1 has identified as GABRIEL directing C1 and other Legacy employees to meet with him. I also observed the person identified as GABRIEL reviewing and writing on what appeared to be patient records.

### D.    GABRIEL's Marketing Offices

25.    C1 and C2 have further stated that GABRIEL has offices at a separate location, which they describe as his "marketing offices," in a three-story townhouse in Chicago, Illinois. According to C1 and C2, GABRIEL hired a staff of "marketers" to recruit new patients for Company A and Company B. Those so-called marketers recruit new patients by obtaining names of Medicare beneficiaries from other individuals in the medical community, cold-calling Medicare beneficiaries on the telephone, and/or visiting them in their homes. C1 and C2 said that they (C1 and C2) have seen faxes which contain new patient information coming into Company B from the marketing offices.

11

## IV. Evidence of False Claims

### A. *Information Provided by Cooperating Individuals*

26.   As stated above, two cooperating individuals (C1 and C2) have come forward and voluntarily provided information of ongoing criminal activity by GABRIEL and others acting at his direction.

27.   C1 and C2 first came to the attention of DHHS/OIG in about October 2008, after they came forward to express their concerns about pervasive fraud occurring during the course of their employment at Company B. C1 has also admitted to receiving illegal kickbacks from Company B in exchange for referring new Medicare patients to Company B.

28.   Over the course of about two years, C1 and C2 continued to provide information and assistance in connection with this investigation. C1 and C2 have not been paid for their information and assistance.

29.   Agents have conducted criminal background checks of C1 and C2 as recently as December 2010, and, according to the information in the criminal databases searched by the agents, neither C1 nor C2 has a criminal record.

30.   C1 has stated that she is a registered nurse with over twenty years of nursing experience (registered in the State of Illinois since 2003), that she is currently employed as Company B's administrator and director of nursing, and that she has held those positions since the time she first began working for

Company B in March 2008. As a result, C1 is believed to have direct, day-to-day knowledge of nearly all the operations of Company B, including payroll, billing, clinical, and personnel. C1 has stated that she has direct contact with Company B nurses and office staff. C1 has further stated that she has regular contact with GABRIEL, both at Company B and at professional gatherings at Company A, as well as in social settings.

31. C2 is C1's sister-in-law. C2 has stated that she too has a background in nursing, though she is not licensed in the State of Illinois. Unlike C1, C2 is no longer employed by Company B. C2 worked for Company B between about March 2008 and October 2009. During that time, C2 was part of Company B's administrative support staff, assigned to a quality assurance position. C2's responsibilities included reviewing Company B patient records. C2 has further stated that as a Company B employee, she was in regular contact with GABRIEL, both in professional and social settings.

32. C1 and C2's personal knowledge of past and present criminal activity by GABRIEL and others stems from reviewing patient files and business records as part of their employment at Company B, conversations with GABRIEL and other employees of Company B and Company A, and conversations with other home health care administrators and providers.

33. Below is a general summary of fraudulent activity conducted by

13

GABRIEL and others acting at his direction, based on the information and assistance provided by C1 and C2 and, where noted below, corroborated by Medicare records or other evidence. C1 and C2 stated that they believe that the same activities were taking place at Company B and Company A based on their employment at Company B, their visits to Company A, and the mixing of Company B and Company A staff.

### 1. Billing for Services Not Provided

34. C1 and C2 have stated that many of the nurses on Company B's payroll also are employees of Company A. They identified two nurses in particular, "Nurse A" and "Nurse B," both of whom were assigned to provide home health services to approximately sixty patients at one point in time. C1 and C2 opined that it would not be possible for one nurse to provide home health care services to that many patients at a time. C1 further stated that these particular nurses, Nurse A and Nurse B, were known as "John's nurses," meaning that they were good friends of GABRIEL and were well taken care of by him.

35. During the investigation, C1 reported that Company B was billing Medicare for a number of patients who were not being seen by nurses from Company B at all. According to C1, some of those patients had refused Company B's services and some of them had been seen once or twice and then cancelled

14

further services. C1 said that she knew of seventeen patients who never had an

initial assessment from a Company B nurse, but for whom Company B had

already billed Medicare. C1 further stated that she told GABRIEL that certain

patients should be discharged from Company B's care, that she argued with him

about billing Medicare for those patients, and that GABRIEL responded, "we are

just borrowing the money from Medicare." C1 further stated that she would

provide agents with five examples of current Company B patients for whom

Company B was fraudulently billing Medicare at GABRIEL's direction.

36.     Two days later (July 10, 2009), C1 faxed a letter to me, setting forth

the names, Medicare beneficiary numbers, dates of birth, and dates of care

allegedly provided to five patients for whom, according to C1, Company B was

fraudulently billing Medicare. Agents then confirmed that patient data through

Medicare contractor TrustSolutions, LLC.[4]  As reported by TrustSolutions,

Medicare records reflect that payments were made to Company A and Company

B for nursing services allegedly provided to those five patients, as summarized

below:

> (a)     Medicare paid approximately $5,456.58 to Company A for two
> episodes of care allegedly provided to Medicare beneficiary "LB" between
> October 29, 2009 and May 25, 2010. According to C1, no initial admission

---

[4]  CMS contracts with private investigative companies, known as Program
Safeguard Contractors ("PSCs"), to identify and develop cases of suspected fraud and
abuse. TrustSolutions, LLC is one such PSC.

visit was conducted by a registered nurse, and no follow up visits were conducted either.

(b)     Medicare paid approximately $2,135.33 to Company B for one episode of care allegedly provided to Medicare beneficiary "DW" between January 5, 2009 and March 5, 2009. According to C1, an episode of service for this patient was not completed, but the patient was recertified without an OASIS form and no nurse conducted follow-up visits.

(c)     Medicare paid approximately $3,546.77 to Company A for one episode of care allegedly provided to Medicare beneficiary "JK" between September 7, 2007 and October 29, 2007. According to C1, no initial admission visit was conducted by a nurse.

(d)     Medicare paid approximately $2,036.41 to Company A for one episode of care allegedly provided to Medicare beneficiary "HM" between June 8, 2010 and July 6, 2010. According to C1, no initial admission visit was conducted by a nurse.

(e)     Medicare paid approximately $1,773.04 to Company A for one episode of care allegedly provided to Medicare beneficiary "BM" between June 8, 2010 and July 6, 2010. According to C1, no initial admission visit was conducted by a nurse.

37.     I also have reviewed Medicare records to determine the amount of money that Company A and Company B have been obtaining from Medicare over the years. With regard to Company A, Medicare records reflect that in 2006, after Company A enrolled in the Medicare program, Company A received more than $2,100,000 in Medicare payments for home health services allegedly provided to approximately 412 patients. In 2007, Company A's patients and Medicare billings increased dramatically: Company A received a total of approximately $8,000,000 from Medicare that year, for services allegedly

16

provided to approximately 969 patients. Company A's Medicare billings have continued to increase steadily, to the point where its billings were exceeding $1,000,000 per month during 2010. In the month of December 2010, Company A received a total of more than $2,195,000 from Medicare.[5]

38. With regard to Company B, Medicare records reflect that in 2007 (before GABRIEL joined Company B), the number of Company B patients on the Medicare rolls (Company B's "average daily census") was 67. At the end of the first quarter of 2008 (after GABRIEL allegedly took control of Company B), Company B's average daily census was 133.[6] Although Company B's census doubled during that short time period, the number of nurses employed by Company B did not increase, according to C1 and C2. In the opinion of C1 and C2, Company B did not have enough nurses to support the growing volume of patients. With regard to Company B's total Medicare billings, Medicare records reflect that Company B received a total of more than $2,900,000 in Medicare payments during 2010.

---

[5] As a point of comparison, Medicare statistics show that, among all home health care providers in Illinois who received payments from Medicare during the first six months of 2010, Company A received more money from Medicare than any other home health care provider in Illinois. (More recent statistics covering billings of all Illinois home health providers during the last six months of 2010 are not currently available.)

[6] Agents obtained this Medicare census data from a Medicare PSC known as TriCenturion.

17

## 2. Upcoding

39.     Home health care providers are required to follow a uniform set of codes, known as Home Health Resource Groups codes, to identify the types of medical services provided to their patients. Those codes determine how much the home health care provider may be reimbursed by Medicare for a given service.

40.     "Upcoding" refers to the fraudulent practice of intentionally using an incorrect code, one that is associated with more complex or more expensive services, rather than using the code applicable to the services which were actually provided, in order to obtain more money from Medicare. According to C1 and C2, upcoding is pervasive at Company B.

41.     C1 has stated that GABRIEL and a Company B employee ("Employee A") fill out the medical diagnoses and coding paperwork for many patients, that at times the diagnosis and coding paperwork would be completed before a nurse even visited a patient, and that at other times GABRIEL and Employee A would alter notes made by nurses who have visited the patients, all so that the records reflect more services than were actually rendered, which would allow Company B or Company A to claim more money from Medicare. C1 provided the following example: in the Activities of Daily Living ("ADL") section of the OASIS form, a nurse may write the number "1" to reflect the patient's

18

actual medical condition ("1" indicating the least severe medical condition), and then GABRIEL or Employee A will change that number to a "3" ("3" indicating the most severe medical condition), without consulting the nurse or having a medical reason for making that change. The alteration is made in either one of two ways: GABRIEL or Employee A will either (a) fill out a new OASIS form altogether, or (b) edit the original form that was filled out by the nurse, falsely noting that the nurse had made an error.

42.     According to C1, GABRIEL has instructed other Company B employees to create false documents reflecting that physicians have called in orders for medical service or prescriptions over the telephone ("telephone orders") on behalf of certain patients, to support claims for services that were never provided to patients.

43.     C1 indicated that all such false and/or altered records are placed in the patients' charts, which are then provided to quality assurance personnel at Company B to complete any remaining portions of the OASIS forms that need to be filled out. From quality assurance, the patient files are passed on to the billing personnel for preparation and submission of the Medicare reimbursement claims.

44.     C1 has further stated that on multiple occasions between October 2008 and March 2010, she observed Employee A completing home health

recertifications (which are required to be signed by a physician) at Company B.

## B.     Interview of Employee A

45.     On the morning of January 25, 2011, agents interviewed Employee A at his residence.

46.     During the interview, Employee A stated, among other things, that:

(a)     GABRIEL hired him to work for Company A in approximately December 2006 and that, although GABRIEL is not formally listed as the owner of Company A, GABRIEL is the behind-the-scenes owner of Company A and is in charge of operations and makes all decisions at Company A.

(b)     Employee A is responsible for conducting data entry and coding for Company A, more specifically, entering patient data and information contained on OASIS forms, which information determines the rate at which Company A is reimbursed by Medicare.

(c)     fraudulent activity (including upcoding) is pervasive at Company A, and GABRIEL directs a lot of such fraudulent activities.

(d)     Employee A filled out OASIS forms which often had no relation to patients' true medical conditions. GABRIEL told Employee A to do this in order to maximize the reimbursement rate. Specifically, GABRIEL told Employee A that they should try to obtain at least $2,800 in reimbursement, even if the patient's condition did not justify that amount of billing. Sometimes nurses would turn in OASIS forms that GABRIEL thought would not generate enough money from Medicare. GABRIEL and Employee A would then shred those OASIS forms and create new ones that added more serious conditions or inflate the amount of time that the nurse spent with the patient.

(e)     When GABRIEL and Employee A destroyed OASIS forms turned in by the nurses and made new ones, GABRIEL forged the nurses signatures on the OASIS forms.

(f)     GABRIEL created reimbursement paperwork before nurses

saw patients. Additionally, GABRIEL submitted Medicare reimbursement claims for patients that have never been seen by nurse.

(g)    although fraud was already being conducted when Employee A first started working at Company A, it took him a few months to realize the extent of the fraud, after which he realized that it "was all bad" and that one day law enforcement would catch on.

## C.    *Interview of a Medicare Beneficiary*

47.    On June 29, 2010, agents interviewed a Medicare beneficiary ("RS") of Chicago, Illinois.  RS stated that approximately two months prior to the interview, he received a Medicare statement in the mail which indicated that he had received home health services from Company A.  After seeing this Medicare statement, RS called the number at the bottom of the statement to report that he had not received any home health services from Company A.  RS told the interviewing agents that he was well aware of what constituted home health services because he was a cancer survivor who had received home health services approximately two to three years ago from a different health care provider. RS further stated that his only contact with Company A came "around Christmas time" in 2009, when he was contacted by a woman from Company A who asked if she could talk to RS about what services Company A could offer. RS further stated that shortly thereafter, two Filipino women came to his apartment and discussed Company A's nursing care.  RS told them that any such care would have to be approved by his primary care physician.  The women

21

then gave RS a small blanket as a gift and left his apartment. RS was not contacted by anyone from Company A after that one visit.

48.  Despite the fact that RS claimed that he was not provided any medical services by Company A, Medicare records show that Company A billed Medicare on or about March 11, 2010, for home health services allegedly provided to RS during the period between December 21, 2009 and February 9, 2010, in the amount of approximately $2,586.99.

## V. Conclusion

49.  Based on the facts set forth above, there is probable cause to believe that GABRIEL has committed a violation of Title 18, United States Code, Sections 287 and 2.

BENJAMIN FOLGER
Special Agent
U.S. Department of Health
and Human Services
Office of Inspector General

Subscribed and sworn to before me
this 25th day of January, 2011.

SIDNEY I. SCHENKIER
United States Magistrate Judge
Northern District of Illinois

22