UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**JUDGE NORGLE**

**MAGISTRATE JUDGE SCHENKIER**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 11 CR 54 |
| | ) | |
| vs. | ) | <u>Violations</u>: Title 18, United |
| | ) | States Code, Sections 1343, |
| JACINTO "JOHN" GABRIEL, JR. | ) | 1347, and 1956(a)(1)(B)(ii) |

<u>**INDICTMENT**</u>

<u>**COUNT ONE**</u>
**(Wire Fraud)**

**FILED**

JUN 2 8 2011

The SPECIAL FEBRUARY 2011-1 GRAND JURY charges:    MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

1.    At times material to this indictment:

<u>**The Medicare Program**</u>

a.    Medicare was a federally-funded national health care benefit program which provided free or below-cost health care benefits to certain eligible individuals ("Medicare beneficiaries"), primarily individuals over the age of 65.

b.    Medicare covered, among other things, home health care, that is, health care services provided to Medicare beneficiaries suffering from illnesses or disabilities which confined them to their homes.

c.    Health care providers, including physicians and home health care agencies, could apply for and obtain a Medicare provider number, enabling them to seek reimbursement for services provided to Medicare beneficiaries.

d.    Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency of United States Department of Health and Human Services.

CMS in turn contracted with private health insurance carriers to process Medicare claims and to perform certain administrative functions. In the State of Illinois, CMS contracted with a health insurance carrier known as Palmetto Government Benefits Administrators ("Palmetto GBA").

e.     It was the primary responsibility of Palmetto GBA to review and process Medicare claims submitted by health care providers who were authorized to participate in the Medicare program ("Medicare providers"). Palmetto GBA paid those claims which appeared, based on the information provided by the Medicare providers, to be eligible for reimbursement under the Medicare program. Payment was made with federal funds.

f.     When making a claim, the Medicare provider was required to provide certain information, including the patient's name and address, a description of the medical service provided to the patient, the date on which the service was provided, and the Medicare payment code associated with that service. Medicare providers could submit Medicare claims electronically, using a computer software program available from Palmetto GBA.

g.     Medicare providers were entitled to be paid only for medically-necessary services provided to eligible Medicare beneficiaries. With regard to home health care services, Medicare authorized payment under the following circumstances:

i.     the Medicare beneficiary was "homebound," meaning that his or her ability to leave the home was restricted due to illness or disability;

ii.     the homebound beneficiary was under the care of a physician

2

who created a specific plan of care for the beneficiary; and

        iii.    the beneficiary's physician signed a Medicare form (Form 485) known as a "Home Health Certification and Plan of Care," setting forth, among other things, the beneficiary's diagnosis, medications, functional limitations, and plan of care, followed by a certification that the beneficiary was homebound, was under that physician's care, and was in need of home health services, such as intermittent skilled nursing care, physical therapy, speech therapy, or occupational therapy.

        h.    Medicare typically approved payment for home health care services provided over 60-day periods of time, each 60-day period known as an "episode of care." After the initial 60-day episode of care, a beneficiary could receive additional 60-day episodes of care, but only if a physician re-certified, in a Form 485, that the beneficiary was still homebound and still in need of home health care services.

        i.    Medicare required the home health care provider to conduct a comprehensive assessment of each patient to determine the patient's eligibility for home health care and the level of skilled care required to adequately care for the patient. In the course of that assessment, the home health care provider was required to gather a specific set of clinical data, known as an Outcome and Assessment Information Set ("OASIS"). Such data typically would be gathered by a nurse in a face-to-face visit with the patient, and recorded on a standard OASIS form.

        j.    Medicare required home health care providers to maintain complete and

accurate medical records documenting each patient's need for home health care and the specific services provided to each patient. Among the records required to be maintained by home health care providers were OASIS forms, Forms 485 signed by physicians, and nurses' notes.

### Perpetual Home Health

k.      Perpetual Home Health, Inc. ("Perpetual") was an Illinois corporation, with a principal place of business at 4821 West 153rd Street, Oak Forest, Illinois.

l.      In 2005, Perpetual applied for enrollment in the Medicare program as a provider of home health care services. Medicare, through Palmetto GBA, granted Perpetual's application and issued Perpetual a Medicare provider number, effective on or about April 25, 2006, pursuant to which Perpetual could begin participating in the Medicare program and submitting claims for reimbursement of home health services provided to Medicare beneficiaries. In May 2006, Perpetual submitted to Palmetto GBA an electronic funds transfer authorization agreement, setting forth its bank account information so that it could receive Medicare reimbursement payments directly into one of its bank accounts at JP Morgan Chase Bank.

m.      Between May 2006 and January 2011, Perpetual submitted over 14,000 Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries. As a result of those claims, Medicare paid Perpetual, through Palmetto GBA, a total of more than $38,000,000, making Perpetual one

4

of the largest recipients of Medicare payments, if not the largest recipient of Medicare payments, for home health care services in the State of Illinois.

### Legacy Home Healthcare Services

n.    Legacy International Services Company, Inc., doing business as Legacy Home Healthcare Services ("Legacy"), was an Illinois corporation located at 4747 West Peterson Avenue, Suite 311, Chicago, Illinois.

o.    In 2004, Legacy applied for enrollment in the Medicare program as a provider of home health care services. Medicare granted Legacy's application and provided Legacy a Medicare provider number, effective on or about October 13, 2004. Legacy subsequently submitted an electronic funds transfer authorization agreement so that it could receive Medicare payments directly into one of its bank accounts at JP Morgan Chase Bank.

p.    Between 2008 and January 2011, Legacy submitted over 2,000 Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries. As a result of those claims, Medicare paid Legacy, through Palmetto GBA, a total of more than $5,000,000.

q.    Neither Perpetual nor Legacy had any sources of revenue other than Medicare funds.

5

## The Defendant

r.   Defendant JACINTO "JOHN" GABRIEL, JR. was one of the founders of Perpetual.  In about 2008, GABRIEL also became an owner of Legacy.  On public records, GABRIEL did not identify himself as an owner of Perpetual or Legacy, though he in fact exercised ownership and control over both companies.

s.   GABRIEL provided direction and exercised control over the Medicare billing policies and practices of Perpetual and Legacy.

t.   GABRIEL had no formal medical training, medical degrees, or licenses to practice as a health care professional.

## The Defendant's Medicare Fraud Scheme

2.   Beginning in or about 2006 and continuing through about January 2011, at Chicago and Oak Forest, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, and others, including officers and employees of Perpetual and Legacy ("co-schemers"), knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money from the Medicare program by means of materially false and fraudulent pretenses, representations, and promises, as described below.

### *Overview of the Scheme*

3.   It was part of the scheme that GABRIEL and his co-schemers caused Perpetual and Legacy to submit millions of dollars in false and fraudulent claims for

6

reimbursement of home health care services allegedly provided to Medicare beneficiaries, which services were not provided, were not medically necessary, or were inflated in price, all so that GABRIEL, his friends, and associates could profit from fraudulently-obtained Medicare funds.

4.     It was further part of the scheme that GABRIEL and his co-schemers defrauded the Medicare program through a variety of methods and means, including, but not limited to:

a.     obtaining personal background information of Medicare beneficiaries to be used to fraudulently bill Medicare without the beneficiaries' knowledge or consent;

b.     creating and falsifying patient files to support false and fraudulent Medicare claims;

c.     submitting reimbursement claims to Medicare based on false and fraudulent patient records;

d.     using proceeds of fraudulent Medicare claims to pay himself, his co-schemers, employees, and others who provided assistance in carrying out the scheme; and

e.     concealing his receipt of fraud proceeds by directing Perpetual and Legacy to issue checks payable to fictitious entities and to his friends and associates.

### A. Obtaining Patient Information

5.     It was further part of the scheme that GABRIEL and others collected, from a variety of sources, personal background information of Medicare beneficiaries – including names, Medicare identification numbers, addresses, and telephone numbers – for purposes

of enrolling them as patients of Perpetual and Legacy and then billing Medicare, regardless of whether the beneficiaries qualified for home health care coverage, regardless of whether they actually needed home health care services, and regardless of whether they actually wanted home health care services.

6.     It was further part of the scheme that GABRIEL and others cold-called Medicare beneficiaries to try to persuade them to enroll with Perpetual and Legacy for home health care services.  At times, GABRIEL misrepresented that he was calling from a physician's office, from a hospital, or from a government agency, in an attempt to add credibility to himself.

7.     It was further part of the scheme that GABRIEL hired marketers to find and enroll new patients at Perpetual and Legacy.  GABRIEL provided Medicare beneficiary information to his marketing staff and directed his marketers to call beneficiaries for purposes of enrolling them at Perpetual and Legacy.

8.     It was further part of the scheme that GABRIEL hired nurses and sent them to Medicare beneficiaries' homes to represent that they would be the beneficiaries' new nurses and to enroll the beneficiaries with Perpetual and Legacy.

9.     It was further part of the scheme that GABRIEL authorized Perpetual and Legacy to pay various sums of money, ranging in amounts from about $200-$800, to Perpetual and Legacy employees, and others, for each patient they referred and enrolled at Perpetual and Legacy.

## B. Falsifying Patient Records

10.     It was further part of the scheme that GABRIEL provided his nursing staff with specific instructions regarding the preparation of patient records. GABRIEL specifically instructed members of his nursing staff not to fill out certain portions of OASIS forms when conducting face-to-face visits with patients. More specifically, GABRIEL instructed nurses not to fill out those portions of the OASIS forms which required them to list the date of the patient visit, the patient's diagnosis, and the patient's ability to do certain basic daily living activities. GABRIEL gave those instructions so that he and his administrative staff could fill in those portions of the forms falsely, in such a way that would enable them to maximize the amount of the reimbursement that they could claim from Medicare, regardless of the patient's actual medical condition or whether services were actually provided to the patient.

11.     It was further part of the scheme that GABRIEL hired a staff of data entry and quality assurance personnel and gave them specific instructions regarding the preparation of patient and billing records. GABRIEL instructed them to complete portions of OASIS forms, knowing that such forms should have been completed by nurses at the time of their visits with patients and knowing that the information set forth on the forms was required to be based on comprehensive assessments of the patients' actual medical conditions. GABRIEL instructed members of his administrative staff to complete OASIS forms with information that he provided, not with information gathered from clinical assessments of the patients, as required by Medicare. At times, GABRIEL completed OASIS forms himself, without any

9

medical basis or nurse's assessment to support the information that he placed on the forms.

12.    It was further part of the scheme that GABRIEL created one-page checklists (at times referred to by Perpetual and Legacy employees as "MO sheets" or "cheat sheets") to assist his data entry and quality assurance personnel in creating false patient records more quickly.  The cheat sheets set forth the data which GABRIEL wanted his administrative personnel to place onto OASIS forms and into the computer billing system.  More specifically, the cheat sheets listed code numbers associated with certain patient medical conditions which GABRIEL wanted his staff to use for purposes of billing Medicare, regardless of the patients' actual medical conditions. GABRIEL directed his data entry staff to enter the data from his cheat sheets into the computer billing system before any physician had ordered home health services for the patients and before the patients were seen and assessed by Perpetual nurses.  GABRIEL also instructed his data entry personnel to enter false dates of nurse visits so that Perpetual and Legacy could immediately bill Medicare for services that had not been provided by Perpetual or Legacy.

13.    It was further part of the scheme that GABRIEL trained his data entry personnel to fill out cheat sheets themselves and he further instructed them to give their cheat sheets to quality assurance personnel to use for purposes of filling out fraudulent OASIS forms. GABRIEL's quality assurance personnel in turn transferred the patient data from the cheat sheets to OASIS forms and placed those false and fabricated OASIS forms in patients' medical files at Perpetual and Legacy.  Among the false information which they placed onto

OASIS forms were patient diagnoses, assessments of patient daily living skills, and dates of alleged nurse visits. At GABRIEL's direction, they systematically listed the same false diagnoses, including arthropathy (joint disease) and hypertension, which would enable them to claim a higher level of reimbursement from Medicare.

14. It was further part of the scheme that if nurses contradicted GABRIEL's instructions by completely filling out OASIS forms, GABRIEL and his administrative staff would subsequently alter the OASIS forms prepared by the nurses. They would alter the nurses' OASIS forms by removing entire sections which had been filled out by the nurses, shredding those pages, and replacing the shredded pages with new pages filled out in accord with the false cheat sheets, all so that the OASIS forms would reflect more severe patient diagnoses and more services rendered to the patients, thereby enabling Perpetual and Legacy to falsely claim a higher level of reimbursement from Medicare.

15. It was further part of the scheme that GABRIEL directed his administrative personnel to create false and fraudulent Forms 485 based in part on the false data set forth on the cheat sheets and false OASIS forms.

16. It was further part of the scheme that GABRIEL's administrative personnel submitted the false and fraudulent Forms 485 to certain physicians to sign and falsely certify that the patients identified on the forms were under the physicians' care and needed home health care services.

17. It was further part of the scheme that GABRIEL and his co-schemers directed

11

Perpetual's bookkeepers to issue checks to pay physicians so that they would sign false and fraudulent Forms 485 for Perpetual. At the direction of GABRIEL and his co-schemers, Perpetual's bookkeepers paid those physicians thousands of dollars, as often as every two weeks, to continuously make themselves available to sign false and fraudulent Forms 485.

18.    It was further part of the scheme that at times when physicians were unavailable or unwilling to sign Forms 485, GABRIEL and others at Perpetual forged physicians' signatures on the forms, thereby falsely certifying that the patients were under the care of a physician, that they qualified for home health services, and that they had authentic plans of care.

## C. Fraudulent Medicare Billing

19.    It was further part of the scheme that GABRIEL caused Perpetual and Legacy to submit Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries, when in fact, as GABRIEL knew, the beneficiaries had not been seen by nurses from Perpetual or Legacy.

20.    It was further part of the scheme that GABRIEL caused Perpetual and Legacy to submit Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries, when in fact, as GABRIEL knew, the beneficiaries were not under the care of a physician who had authorized home health care services.

21.    It was further part of the scheme that GABRIEL caused Perpetual and Legacy

to submit Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries, when in fact, as GABRIEL knew, no services had been provided by Perpetual or Legacy.

22.     It was further part of the scheme that GABRIEL caused Perpetual and Legacy to submit Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries, when in fact, as GABRIEL knew, the beneficiaries were not homebound, did not need home health services, or had been intentionally misdiagnosed by GABRIEL and his staff in order to claim a higher rate of reimbursement.

23.     It was further part of the scheme that GABRIEL caused Perpetual and Legacy to submit Medicare claims to Palmetto GBA, seeking reimbursement for home health care services allegedly provided to Medicare beneficiaries who had been referred to them through bribes or kickback payments.

24.     It was further part of the scheme that GABRIEL and his co-schemers caused Palmetto GBA to reimburse Perpetual and Legacy for false and fraudulent claims via direct deposit of Medicare funds into the bank accounts of Perpetual and Legacy at JP Morgan Chase Bank.

### D.  Use of Fraud Proceeds

25.     It was further part of the scheme that GABRIEL and his co-schemers received proceeds of false and fraudulent Medicare claims by withdrawing money from the bank

13

accounts of Perpetual and Legacy, in an amount totaling more than $5,500,000.

26.     It was further part of the scheme that GABRIEL and his co-schemers used proceeds of the fraud scheme to maintain lavish lifestyles, to pay their personal expenses, to gamble at casinos in the Chicago area and Las Vegas, and to acquire assets, including vehicles, real estate in the United States and the Philippines, and jewelry.

27.     It was further part of the scheme that GABRIEL and his co-schemers used proceeds of the fraud scheme to pay salaries of Perpetual and Legacy employees in order to continue the scheme, and to provide his employees with gifts, such as jewelry and vehicles.

28.     It was further part of the scheme that GABRIEL and other Perpetual and Legacy employees used proceeds of the fraud scheme to bribe physicians as described above, and to pay kickbacks to others in exchange for referrals of patients.

### E. Concealment of the Fraud Scheme

29.     It was further part of the scheme that GABRIEL concealed the existence of the scheme, the purposes of the scheme, and the acts done in furtherance of the scheme, by the following means, among others:

      a.     not conducting business or financial transactions in his own name;

      b.     not opening bank accounts in his own name;

      c.     not purchasing vehicles or property in his own name;

      d.     directing his brother and others to purchase vehicles and property for him, with Perpetual's funds, and without placing title in his name;

14

e.      directing friends and associates to set up fictitious businesses as fronts for receiving and cashing checks for him;

f.      directing Perpetual and Legacy to issue checks payable to those fictitious businesses, namely, "MR Enterprises" and "Blue Cross Consulting, LLC";

g.      directing Perpetual and Legacy to issue payroll checks payable to ghost employees, in particular, to certain friends and associates of his, for purposes of diverting cash to him;

h.      directing Perpetual and Legacy to issue the above-described checks in amounts under $10,000, so as to avoid currency transaction reporting requirements when cashing the checks;

i.      providing the above-described checks to his friends and associates and directing them to cash the checks and to provide the cash to him;

j.      cashing checks payable to MR Enterprises and Blue Cross Consulting at a currency exchange in Chicago, Illinois; and

k.      paying physicians indirectly through third parties.

*Losses Incurred by Medicare*

30.     During the course of the scheme, GABRIEL and his co-schemers caused Perpetual and Legacy to submit thousands of false and fraudulent claims to Palmetto GBA, claiming millions of dollars in Medicare funds to which they were not entitled. Palmetto GBA paid those false and fraudulent claims, unaware that the claims sought reimbursement for services that had not been provided, were not medically necessary, were inflated, or were submitted on behalf of patients procured through bribes and kickbacks. As a result of the false and fraudulent claims that GABRIEL and his co-schemers caused to be submitted to Palmetto GBA, Medicare incurred losses in an amount totaling at least $20,000,000.

31.     On or about March 12, 2010, at Oak Forest, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, for the purpose of executing the scheme described above, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, a false and fraudulent Medicare claim, transmitted electronically from Perpetual in Oak Forest, Illinois, to Palmetto GBA in Camden, South Carolina, which claim sought reimbursement in the amount of approximately $2,586 for home health care services allegedly provided to a Medicare beneficiary (initials R.S.) during the period between December 21, 2009 and February 9, 2010;

In violation of Title 18, United States Code, Section 1343.

## COUNT TWO
### (Wire Fraud)

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1. Paragraphs 1 through 30 of Count One of this indictment are realleged and incorporated as though fully set forth herein.

2. On or about October 18, 2010, at Oak Forest, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, for the purpose of executing the scheme described in Count One, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, a false and fraudulent Medicare claim, transmitted electronically from Perpetual in Oak Forest, Illinois, to Palmetto GBA in Camden, South Carolina, which claim sought reimbursement in the amount of approximately $2,586 for home health care services allegedly provided to a Medicare beneficiary (initials L.T.) during the period between September 13, 2010 and October 15, 2010;

In violation of Title 18, United States Code, Section 1343.

## COUNT THREE
### (Health Care Fraud)

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.     Paragraph 1 of Count One of this indictment is realleged and incorporated as though fully set forth herein.

2.     Beginning in or about 2006 and continuing through about January 2011, at Chicago and Oak Forest, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, and others, devised, intended to devise, and participated in a scheme to defraud a health care benefit program affecting commerce, namely, the Medicare program, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, the Medicare program, in connection with the delivery of and payment for health care benefits, items, and services.

3.     Paragraphs 3-30 of Count One are realleged and incorporated as though fully set forth herein.

4.     On or about October 16, 2009, at Oak Forest, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, knowingly and willfully executed, and attempted to execute, the health care fraud scheme by causing Perpetual to submit a false and fraudulent Medicare claim to Palmetto GBA, which claim sought reimbursement in the amount of approximately $1,305

18

for home health care services allegedly provided to a Medicare beneficiary (initials A.B.) during the period between July 17, 2009 and August 15, 2009;

In violation of Title 18, United States Code, Section 1347.

## COUNT FOUR
**(Health Care Fraud)**

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

1.      Paragraphs 1 and 3-30 of Count One of this indictment, and Paragraph 2 of Count Three of this indictment, are realleged and incorporated as though fully set forth herein.

2.      On or about June 14, 2010, at Oak Forest, in the Northern District of Illinois, Eastern Division, and elsewhere,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, knowingly and willfully executed, and attempted to execute, the health care fraud scheme by causing Perpetual to submit a false and fraudulent Medicare claim to Palmetto GBA, which claim sought reimbursement in the amount of approximately $1,160 for home health care services allegedly provided to a Medicare beneficiary (initials P.A.) during the period between March 6, 2010 and April 30, 2010;

In violation of Title 18, United States Code, Section 1347.

## COUNTS FIVE THROUGH FIFTEEN
### (Money Laundering)

The SPECIAL FEBRUARY 2011-1 GRAND JURY further charges:

On or about the dates set forth below, each such date constituting a separate count of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division,

### JACINTO "JOHN" GABRIEL, JR.,

defendant herein, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted such a financial transaction which in fact involved the proceeds of specified unlawful activity, namely, the wire fraud scheme described in Count One of this indictment, knowing that the transaction was designed in whole and in part to avoid a transaction reporting requirement under Federal law; more specifically, GABRIEL cashed checks in the following amounts on the following dates at a currency exchange in Chicago, Illinois, a financial institution which was engaged in, and the activities of which affected, interstate commerce, which checks were written on the account of Perpetual, made payable to fictitious businesses, namely, "MR Enterprises" and "Blue Cross Consulting, LLC," in amounts under $10,000, all to avoid a Federal currency transaction reporting requirement:

| Count | Date | Payee | Check No. | Amount |
|-------|------|-------|-----------|--------|
| Five | October 28, 2010 | MR Enterprises | 114418 | $9,000 |
| Six | October 28, 2010 | MR Enterprises | 114423 | $9,000 |
| Seven | November 17, 2010 | MR Enterprises | 114782 | $9,000 |

| Eight | November 19, 2010 | MR Enterprises | 114783 | $9,000 |
|---|---|---|---|---|
| Nine | November 19, 2010 | Blue Cross Consulting, LLC | 114526 | $5,000 |
| Ten | December 15, 2010 | MR Enterprises | 115257 | $9,000 |
| Eleven | December 15, 2010 | MR Enterprises | 115258 | $9,000 |
| Twelve | December 30, 2010 | MR Enterprises | 115504 | $9,000 |
| Thirteen | December 30, 2010 | MR Enterprises | 115505 | $9,000 |
| Fourteen | December 30, 2010 | MR Enterprises | 115506 | $9,000 |
| Fifteen | December 30, 2010 | Blue Cross Consulting, LLC | 115518 | $5,000 |

In violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

## FORFEITURE ALLEGATION ONE
### (Proceeds of Wire Fraud Offenses)

The SPECIAL FEBRUARY 2011-1 GRAND JURY alleges:

1.    The allegations in Counts One and Two of this indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.    As a result of his violations of Title 18, United States Code, Section 1343, as alleged in Counts One and Two,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all right, title, and interest he may have in any property, real and personal, which constitutes and was derived from proceeds traceable to such violations.

3.    The interests of GABRIEL subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), include the sum of $20,000,000.

4.    If any of the forfeitable property described above, as a result of any act or omission by GABRIEL:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third party;

23

      c.      has been placed beyond the jurisdiction of the court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c);

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

### FORFEITURE ALLEGATION TWO
**(Proceeds of Health Care Fraud Offenses)**

The SPECIAL FEBRUARY 2011-1 GRAND JURY further alleges:

1.      The allegations in Counts Three and Four of this indictment are realleged and incorporated herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2.      As a result of his violations of Title 18, United States Code, Section 1347, as alleged in Counts Three and Four,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all right, title, and interest which he may have in any property, real and personal, that constitutes and was derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses.

3.      The interests of GABRIEL subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(7), include the sum of $20,000,000.

4.      If any of the property subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission by GABRIEL:

    a.      cannot be located upon the exercise of due diligence;

    b.      has been transferred or sold to, or deposited with, a third party;

    c.      has been placed beyond the jurisdiction of the court;

25

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute assets under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1);

     All pursuant to Title 18, United States Code, Section 982(a)(7).

## FORFEITURE ALLEGATION THREE
### (Funds Involved in Money Laundering Offenses)

The SPECIAL FEBRUARY 2011-1 GRAND JURY further alleges:

1.     The allegations in Counts Five through Fifteen of this indictment are realleged and incorporated herein for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(1).

2.     As a result of his violations of Title 18, United States Code, Section 1956(a)(1)(B)(ii), as alleged in Counts Five through Fifteen,

JACINTO "JOHN" GABRIEL, JR.,

defendant herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all right, title, and interest which he may have in any property, real and personal, involved in such offenses, and any property traceable to such property.

3.     The interests of GABRIEL subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(1), include the sum of $91,000.

4.     If any of the property subject to forfeiture pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission by GABRIEL:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

e.     has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute assets under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1);

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

28